UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOMAS B. MURPHREE                    CIVIL ACTION

VERSUS                                NO: 05-111

COMMUNICATION TECHNOLOGIES,           SECTION: R(5)
INC.


## ORDER AND REASONS

Defendant Communication Technologies, Inc. ("COMTek") moves for summary judgment under Fed. R. Civ. P. 56 against Plaintiff Thomas Murphree.  For the following reasons, the Court DENIES the motion in part and GRANTS the motion in part.


**I.  Background**

In March 2000, Major Thomas Murphree was hired by MPRI, Inc., a military support contractor, to serve as an Assistant Professor of Military Science (APMS) at Tulane University.  At that time, MPRI was three years into a four-year contract with the United States Army to staff the ROTC system partially with

contract employees.  As part of the contract, MPRI filled two APMS positions at Tulane.  In addition to his professional employment at Tulane, Major Murphree was also an officer in the United States Army Reserve.

Shortly before the expiration of MPRI's contract, the Army put the contract up for re-bid.  The Army awarded the contract to Communication Technologies, Inc. over MPRI and the other competitors on November 15, 2001.  COMTek assumed the contract about six months later.  COMTek asserts that, several days later, it notified all MPRI employees, including Murphree, that it had won the contract and that the employees would likely be contacted by COMTek to negotiate employment.  COMTek further maintains that it told Murprhee that it would attempt to retain the MPRI employees, if possible.

On about November 24, 2001, Major Murphree was ordered to active duty in the Army for a one-year period.  As part of his service, Major Murphree spent time in the Middle East and Central Asia in support of ongoing operations in Iraq and Afghanistan. On February 4, 2002, during Major Murphree's deployment to Kuwait, MPRI made a permanent offer of employment to Michael Kazmierzak to serve as one of the Assistant Professors of Military Science at Tulane.  Kazmierzak was, in effect, filling Major Murphree's position.  Although it is unclear when exactly

2

Kazmierzak's work began, COMTek hired Kazmierzak into the same position he had been offered by MPRI.

During this period, the Army office in charge of overseeing the staffing of APMS positions nationwide reallocated one of the two APMS positions from Tulane to Jacksonville State University in Alabama.  One of the two individuals holding APMS positions at Tulane was already planning to resign his position on May 31, 2002.  After that point, Michael Kazmierzak would hold the only APMS position at Tulane.

On April 1, 2002, COMTek assumed the contract.  In response to an inquiry from Major Murphree, on April 25, 2002, COMTek informed Major Murphree that one of Tulane's APMS positions would be reallocated to Jacksonville State University and that COMTek had already hired the person who would serve in the remaining position at Tulane.  COMTek also invited Major Murphree to apply for any available APMS position in the nation, but it asserted that COMTek owed him no re-employment obligation because his previous employment had been with MPRI.  In July 2002, after Major Murphree sought the assistance of the U.S. Department of Labor's Veterans Employment and Training Service (VETS), COMTek offered him the APMS position at Jacksonville State.  Major Murphree declined the offer because he viewed the position at Jacksonville State as inferior to his position at Tulane, and he

3

did not wish to relocate his family from the New Orleans area to Jacksonville, Alabama.  Further, COMTek did not offer to reimburse Major Murphree's relocation expenses.  On August 15, 2002, the Army released Major Murphree from active duty.

VETS completed an investigation and determined that COMTek was a successor-in-interest to MPRI, which meant that COMTek owed Major Murphree re-employment rights.  Further, VETS determined that the Jacksonville State position was not comparable to Major Murphree's previous position at Tulane.  Despite these findings, COMTek did not offer Major Murphree a position at Tulane.  Unable to regain his position at Tulane, Major Murphree asked to return to active duty in the military.  Since then, Major Murphree has redeployed to the Middle East twice more.

On November 29, 2004, Major Murphree sued COMTek in state court in Louisiana.  Major Murphree made claims under four theories: (1) that COMTek's failure to rehire him into his original position or a position of like seniority, status, or pay constituted a violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301-4033; (2) that COMTek's failure to rehire him into his original position constituted a violation of the Louisiana Military Service Relief Act, La. R.S. 29:401-426 (LMSRA); (3) that Major Murphree was a third-party beneficiary of the contract between the Army and

4

COMTek, and that COMTek breached its contractual obligation by failing to rehire Major Murphree; and (4) that COMTek's notifying Major Murphree of its intention not to rehire him while he was in a combat zone constituted intentional infliction of emotional distress.

On July 11, 2006, COMTek moved for summary judgment. It asserted that COMTek was not a successor-in-interest to MPRI, so that it owed no re-employment obligation to Major Murphree under USERRA or LMSRA. COMTek also argued that Major Murphree's state law claims were prescribed under Louisiana's one-year prescriptive period for tort claims and that the uncontested facts establish that it neither owed, nor breached, any duty to Major Murphree sufficient to support a tort claim under state law. On September 1, 2006, COMTek filed a supplemental motion for summary judgment, asserting that COMTek experienced "changed circumstances," an exception to USERRA under 38 U.S.C. § 4312(d)(1)(A), and that COMTek was not motivated by Major Murphree's military status when it decided not to hire him.

## II.  Legal Standard – Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c));

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish that a genuine issue exists for trial.  *See Id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996). The Fifth Circuit has held that courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

### III.  DISCUSSION

#### A.  USERRA Claim

##### 1.  Successor Liability

USERRA prohibits discrimination against individuals on the basis of their service in the uniformed services of the United States.  *See* 38 U.S.C. § 4301(a)(3).  When an individual must leave an employment position to serve in the military, that individual is entitled to re-employment upon his or her return from service, subject to certain restrictions.  *See generally*, 38 U.S.C. § 4312.  USERRA requires the individual who seeks to enforce its provisions to have been an employee of the defendant company.  *Id*.  The term "employer" generally means "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities."  38 U.S.C. § 4303(4)(A).  USERRA does, however, provide that the term "employer" includes "any successor-in-interest to a person, institution, organization or other entity" that meets the definition of "employer."  38 U.S.C. § 4303(4)(A)(iv).  USERRA does not specifically define "successor-in-interest," and this question is one of first impression in the Fifth Circuit.  COMTek argues that it is not a successor-in-interest because there was no merger or transfer of assets

7

between it and MPRI.

In the context of a Vietnam Era Veterans' Readjustment Assistance Act claim, the Eighth Circuit Court of Appeals chose a "business continuity test" over an "ownership and control" test to define successor-in-interest. *Leib v. Georgia-Pacific Corp.*, 925 F.2d 240, 244-47 (8th Cir. 1991). In choosing that test, the Court of Appeals noted that "courts have universally held that the veterans' reemployment statute is 'to be liberally construed for the benefit of those who left private life to serve their country.'" *Id.* at 245 (citations omitted). The Court further noted that the statute:

> clearly manifests a purpose and desire on the part of Congress to provide as nearly as possible that persons called to serve their country in the armed forces should, upon returning to work in civilian life, resume their old employment without any loss because of their service to their country.

*Id.* (citing *Accardi v. Pennsylvania R.R.*, 383 U.S. 225, 228 (1966)).

The business continuity test emphasizes the actual undertakings of the alleged predecessor and successor companies, rather than the transfer of formal ownership. The Eighth Circuit chose this test, in part, to ensure that "a simple paper transaction" does not defeat the re-employment rights of a returning veteran. *Leib,* 925 F.2d at 245. The *Leib* test asks

8

whether there is (1) substantial continuity of the same business operations; (2) use of the same plant; (3) continuity of work force; (4) similarity of jobs and working conditions; (5) similarity of supervisory personnel; (6) similarity in machinery, equipment, and production methods; (7) similarity of products or services; (8) notice to the employer of the claimant's status at the time of the succession; and (9) any ability for the predecessor to provide relief.  *Id.* at 247 (citation omitted); *see also Rojas v. TK Communications, Inc.*, 87 F.3d 745, 750 (5th Cir. 1996) (endorsing the *Leib* test).

COMTek relies on a recent decision by the Eleventh Circuit Court of Appeals, *Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231 (11th Cir. 2005), which addressed the specific issue of successor-in-interest liability under USERRA.  In that case, the original employer, Del-Jen, re-hired Coffman, but, because Del-Jen had lost its primary contract, it was not able to offer Coffman his previous job.  *Coffman*, 411 F.3d at 1232-34.  The company that won the primary contract, Chugach, negotiated with Coffman but ultimately decided against hiring him, whereupon Coffman sued to assert his re-employment rights under USERRA. *Id.*  The Court of Appeals refused to consider the factors relied on by the Eighth Circuit in *Leib* to determine successor-in-interest status.  It held that consideration of these factors was

9

"unnecessary and improper when no merger or transfer of assets even transpired between the two subject companies." *Id.* at 1237 (citing *Kicinski v. Constable Hook Shipyard*, 168 F.2d 404, 408-09 (3d Cir. 1948)).  The Court thus found that a merger or transfer of assets was a prerequisite for successor liability under USERRA.  Because there had been no merger or transfer of assets between Del-Jen and Chugach, the Eleventh Circuit held that Chugach owed no duty to re-employ Coffman.

The Court believes that the Fifth Circuit Court of Appeals would apply the *Leib* test and would not apply the *Coffman* analysis.  Although the Fifth Circuit has not ruled on this issue in this context, it has endorsed the *Leib* test for successor liability in other employment law contexts.  *See Rojas*, 87 F.3d at 750.  In *Rojas*, the Fifth Circuit held that that the primary considerations in determining successor liability are (1) notice to the successor, (2) ability of the predecessor to provide relief, and (3) continuity of business operations.  *Id.* at 750 (citing *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985)).  In that formulation, "continuity of business operations" captures the remaining *Leib* factors, which do not include any merger or transfer requirement.  *Rojas*, 87 F.3d at 750.  This suggests that the Fifth Circuit would apply the same test here.

Further, the successor liability regulations under USERRA

10

essentially adopt the *Leib* factors and do not include a merger or transfer of assets as a factor to consider.  *See* 20 C.F.R. § 1002.35.  The primary regulation provides:

> USERRA's definition of "employer" includes a successor in interest.  In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former employer.  The determination whether an employer is a successor in interest must be made on a case-by-case basis using a multi-factor test that considers the following:
>
> (a) Whether there has been a substantial continuity of business operations from the former to the current employer;
>
> (b) Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production;
>
> (c) Whether there has been a substantial continuity of employees;
>
> (d) Whether there is a similarity of jobs and working conditions;
>
> (e) Whether there is a similarity of supervisors or managers; and,
>
> (f) Whether there is a similarity of products or services.

*Id.*  A companion regulation, 20 C.F.R. § 1002.36, provides that "it is not necessary for an employer to have notice of a potential reemployment claim at the time of merger, acquisition, or other form of succession."  *Id.*  COMTek argues that this language assumes that a merger or transfer of assets is a

11

prerequisite to successorship.  On the contrary, the disjunctive language of the regulation establishes that a merger or acquisition is *not* required.  The language "other form of succession" recognizes a residual category in which a party can become a successor-in-interest without a merger or acquisition.  Thus, while the existence of a merger or transfer of assets can be relevant, it is not determinative of the successor-in-interest issue.  These regulations, which became effective after the holding in *Coffman*, are entitled to deference from this Court. *See Sykes v. Columbus & Greenville Railway*, 117 F.3d 287, 295 (5th Cir. 1997) (relying on Department of Labor regulations issued under USERRA).

Similarly, the legislative history of USERRA indicates that the use of the *Leib* analysis is proper: "[t]he Committee intends that the multi-factor analysis utilized by the court in [*Leib*] is to be the model for successor in interest issues . . . ."  H.R. Rep. 103-65, *reprinted in* 1994 U.S.C.C.A.N. 2449 at 2454.  The legislative history further suggests that lack of notice by the successor-in-interest of a reemployment rights claim at the time of the succession should not be a factor in the analysis under USERRA to determine if one company was the successor to another:

> In actual practice, it is possible that the successor would not have notice that one or more employees are absent from employment because of military

12

> responsibilities and a returning serviceperson should
> not be penalized because of that lack of notice.

*Id.*

Finally, the Sixth Circuit Court of Appeals this year
addressed successor liability under the Family and Medical Leave
Act (FMLA) and concluded that a merger or transfer of assets was
not a precondition to successor liability under FMLA. *Cobb v.
Contract Transport, Inc.*, 452 F.3d 543, 550-51 (6th Cir. 2006).
The *Cobb* Court contrasted the Eleventh Circuit's rigid,
"corporate law concept[ion]" of successor liability with the more
flexible approach typically used in the labor context. *Id.* at
551-554. The court explained that "the labor law concept of
successor liability requires courts to balance the equities of
imposing a particular legal obligation in a particular situation,
considering 1) the interests of the defendant-employer, 2) the
interests of the plaintiff-employee, and 3) the federal policy
embodied in the relevant statutes." *Id.* at 554-55. In balancing
the equities, the court noted that the imposition of successor
liability would better effectuate Congress's stated purposes in
enacting the FMLA. *Id.* at 556-57. Finally, the court found
that, under the statute, the duty arose from the employee's
status, not the employer's, and thus "should survive a change in
management." *Id.* at 557.

The Court further finds that the federal policy underlying USERRA strongly disfavors making a merger or transfer of assets the *sine qua non* of successor liability.  The statute was designed to protect servicemembers from employment discrimination, and to minimize disadvantages to their civilian careers and disruptions to their lives because of military service.  *See* 38 U.S.C. § 4301.  The statute's purposes are stated in its opening provisions:

(a) The purposes of this chapter are –

    (1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;

    (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and

    (3) to prohibit discrimination against persons because of their service in the uniformed services.

*Id.*  Thus the policy arises from the employee's status, not the employer's.  As the Sixth Circuit reasoned, such a duty should survive a change in management.  Further, the statute's protective purposes would be defeated by the rigid application of a merger or transfer of assets test.

For all of the foregoing reasons, the Court finds that a

merger or transfer is not a prerequisite to successor liability, and that successorship should be determined by resort to the *Leib* factors.

COMTek submits no evidence to show that it is not a successor-in-interest under the *Leib* factors or the regulations. The evidence before the Court tends to support the plaintiff's position.  First, COMTek promised substantial continuity in its transition manual.  (R. Doc. 20-3, Ex. 2).  COMTek emphasized its ability to provide an "uninterrupted and seamless transition of functional support."  *Id.* at p. E-2.  Second, the COMTek proposal indicates that there was significant continuity in the equipment used from MPRI to COMTek.  *Id.* at p. E-8.  Third, COMTek's proposal details its intention to provide substantial continuity of employees after the transition.  *Id.* at p. I-10.  This included honoring incumbent tenure for seniority-based benefits. *Id.*  Fourth, it is clear from circumstances of the transition that there was substantial similarity of jobs and working conditions.  The transition manual emphasizes "[a]ssumption of responsibility for ongoing work."  *Id.* at p. I-12.  Further, it is evident that the position of APMS retained its title and basic function after the transition to COMTek.  Fifth, Cadet Command clearly retained its administrative oversight of the ROTC program after the transition.  Sixth, it is clear that the services

15

provided by COMTek employees under the contract are the same as those provided by MPRI employees under the previous contract. Finally, although the regulations do not incorporate these *Leib* factors in the listing of successor-in-interest considerations under USERRA, the Court notes that COMTek did in fact have notice of the claim and, because it still controls the single APMS position at Tulane, COMTek has the ability to provide relief. (R. Doc. 29-2 at Ex. 3).  This evidence establishes, at the very least, that there is a genuine issue of material fact as to whether COMTek was a successor-in-interest to MPRI.  Accordingly, summary judgment as to COMTek's assertion that it was not a successor-in-interest to MPRI is not appropriate.

### 2.  Changed Circumstances

In its supplemental motion for summary judgment COMTek argues that it owes no duty of re-employment to Major Murphree because it has established that its "circumstances have so changed as to make such reemployment impossible or unreasonable" under 38 U.S.C. § 4312(d)(1)(A).  (R. Doc. 36 at p.10).  COMTek argues that its decision to hire Michael Kazmierzak, the transfer of one of the APMS positions to Jacksonville State, and its offer of the Jacksonville State position to Major Murphree establish that it would be unreasonable or impossible for COMTek to offer a

16

position at Tulane to Major Murphree.  On the subject of changed circumstances, USERRA is clear that the employer has the burden of proving the impossibility or unreasonableness of the obligation to re-hire.  38 U.S.C. § 4312(d)(2).

The Fifth Circuit, in considering a very similar exemption under the predecessor statute to USERRA, stated that "[t]he purpose of the exemption is to allow employers who have eliminated a reservist's position or otherwise drastically changed their business to avoid rehiring someone for a job that no longer exists." *Cole v. Swint*, 961 F.2d 58, 60 (5th Cir. 1992).  In that case, the Court found that the hiring of a replacement for the individual asserting re-employment rights did not constitute changed circumstances under the statute.  *Id.*  The Court noted that "if mere replacement of the employee would exempt an employer from the Act, its protections would be meaningless."  *Id.*

In this case, MPRI hired Michael Kazmierzak into Major Murphree's position as an APMS at Tulane in February 2002.  Upon the transition from MPRI to COMTek, COMTek hired Kazmierzak to continue in his APMS position.  During the same period, the Army mandated the reallocation of one of the APMS positions to Jacksonville State.  The second position at Tulane was eliminated when the individual holding it resigned for another job.  COMTek

17

argues that it offered the Jacksonville State position to
Murphree and he declined the offer.  COMTek further argues that
it was impossible for it to hire Murphree into his previous
position at Tulane because that position had been eliminated by
the Army.  But it is clear that Murphree's position still existed
after the reallocation and that it was held by his replacement,
Michael Kazmierzak.  Without question, had Murphree never been
called up, he would have retained his position as an APMS when
the other APMS resigned.  Thus, COMTek's argument is that, in
essence, the hiring of a replacement employee on a permanent
basis constitutes changed circumstances.  Under *Cole*, this
argument is without merit.  COMTek has not carried its burden of
proving the impossibility or unreasonableness of re-hiring
Murphree.  Accordingly, COMTek is not entitled to summary
judgment on this ground.

### 3.  Comparable Positions

COMTek argues that its offer of an APMS position at
Jacksonville State fulfilled its obligation to provide "a
position of like seniority, status and pay."  38 U.S.C. §
4313(a)(2)(A).  The record does not establish that the
Jacksonville State position offered similar seniority or pay to
Murphree's previous position at Tulane.  The only evidence of pay

18

is Muphree's testimony that he would not have received moving expenses if he accepted the position at Jacksonville State. (R. Doc. 36-3, Ex. 1(A) at p. 128). Further, it is undisputed that VETS determined that the Jacksonville State position was not comparable to Murphree's position at Tulane. Interpreting the evidence in a light most favorable to the non-moving party, the Court concludes that there are material issues of fact as to whether the Jacksonville State position was one of like seniority, status or pay to the Tulane position. Accordingly, COMTek is not entitled to summary judgment on this ground.

### 4.  Discriminatory Motivation

COMTek argues that Major Murphree's military status was not a motivating factor in COMTek's decision not to hire him. COMTek cites 38 U.S.C. § 4311 for the proposition that Major Murphree must prove that COMTek's decision not to employ him was motivated by his military status. Major Murphree's claim, however, arises under 38 U.S.C. § 4312, which does not require a showing of discriminatory intent. *See Coffman*, 411 F.3d at 1235; *see also Wrigglesworth v. Brumbaugh*, 121 F. Supp. 2d 1126, 1135 (W.D. Mich. 2000). Accordingly, the Court finds that COMTek is not entitled to summary judgment on this basis.

**B.   LMSRA Claim**

COMTek asserts the same successor-in-interest argument in favor of summary dismissal of Major Murphree's LMSRA claim as it did for the USERRA claim.  (R. Doc. 17-2 at p. 10).  LMSRA provides:

> The provisions of . . . [USERRA] are adopted and made a part of this Part, and all of the benefits, protections, and rights provided in . . . USERRA shall be applicable to all persons called to service in the uniformed services . . . and shall be enforceable pursuant to the provisions of this Section.

La. R.S. § 29:422(A)(1).  Although LMSRA provides a separate re-employment right under La. R.S. § 29:410, the statute does not expressly define "employer."  La. R.S. § 29:403.  But because LMSRA adopts the protections of USERRA, the Court finds that the definition of "employer," as applied in USERRA, applies under La. R.S. § 29:422(A)(1).  By adopting wholesale the provisions of USERRA, Louisiana provides at least as expansive a definition of "employer" as that used in the USERRA context.  The Court has already determined that there is a genuine issue of material fact as to whether COMTek was a successor-in-interest to MPRI, and therefore an employer to Murphree.  COMTek has brought no evidence or argument that would alter this analysis under Louisiana law.  In fact, COMTek merely re-urges its USERRA arguments in arguing for summary judgment under LMSRA.

Accordingly, COMTek is not entitled to summary judgment on this basis.

**D.  Prescription**

COMTek argues that Major Murphree's state tort law claims are barred because the acts or omissions alleged took place in the Spring of 2002 and the case did not commence until November 2004, thus violating the one-year prescriptive period for tort suits under Louisiana law.  But as Major Murphree has pointed out, the Servicemembers Civil Relief Act (SCRA) provides that "[t]he period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the brining of any action or proceeding in a court . . . by the servicemember . . . ."  50 App. U.S.C. § 526(a).  Major Murphree has submitted evidence indicating that he was in military service during all or nearly all of the alleged prescriptive period.  (R. Doc. 20-4, Ex. 5).  COMTek has not responded to this assertion by Major Murphree.  Viewing the evidence in the light most favorable to the non-moving party, COMTek has not established that Major Murphree's state tort claims are prescribed.  Accordingly, summary judgment is not appropriate on this ground.

21

### E.   Duty Owed – *Stipulation Pour Autrui*

COMTek argues that it owed no duty to Major Murphree, the breach of which could be the basis of a claim under theories of *stipulation pour autrui.*  Louisiana law provides that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary."  La. C.C. Art. 1978.  The third party may then enforce the contract even if the original parties agree to dissolve the contract.  *Id.*  Murphree argues that he was a beneficiary of the agreement between the Army and COMTek, which allegedly provided that COMTek would abide by all employment discrimination laws, including those that protect veterans.  Murphree further argues that COMTek was contractually obligated to abide by the employment discrimination rules at Tulane, and that he was a third-party beneficiary of that agreement as well.

Despite these allegations, the Court can find no evidence in the record indicating the existence of a third-party obligation owing to Murphree.  Murphree points to no particular provision of the portions of the contract between COMTek and the Army that were furnished to the Court that could support a finding of a *stipulation pour autrui*.  Further, there is no evidence in the record of any agreement between COMTek and Tulane that might form the basis of such a third-party obligation.  In the absence of

22

evidence of the provisions of the agreements concerning which
Murphree claims he was the intended, third-party beneficiary, the
Court must conclude that the record contains insufficient proof
as to an essential element of Murphree's claim.  Accordingly,
COMTek is entitled to summary judgment on this claim.

### F.   Intentional Infliction of Emotional Distress

As to Murphree's intentional infliction of emotional
distress claim, COMTek similarly argues that Murphree has not
proved that COMTek owed him a duty.  COMTek further argues that
Murphree cannot prove a breach of any duty.  The Louisiana
Supreme Court has held that, in order to recover for intentional
infliction of emotion distress, a plaintiff must prove:

> (1) that the conduct of the defendant was extreme and
> outrageous;
> (2) that the emotional distress suffered by the
> plaintiff was severe; and
> (3) that the defendant desired to inflict severe
> emotional distress or knew that severe emotional
> distress would be certain or substantially certain to
> result from [its] conduct.

*White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).  The
elements of the tort clearly do not include a particular duty of
care.  *White* involved a profane outburst by a supervisor that led
to a panic attack by the plaintiff.  *Id.* at 1207.  The court
found that the defendant did not breach its duty because the

conduct was not extreme or outrageous.  *Id.* at 1211.  The Court clarified in that case that the defendant had a "duty . . . not to engage in extreme or outrageous conduct intended or calculated to cause severe emotional distress."  *Id.* at 1211.  COMTek's conclusory argument that it owed no duty to Murphree does not establish as a matter of law why it would not owe Murphree a duty not to intentionally inflict emotional distress upon him.

As to COMTek's argument that Murphree cannot prove the breach of any duty, COMTek has not briefed the elements of a claim for intentional infliction of emotional distress or explained why its conduct fails to meet the elements of such a claim.  Accordingly, COMTek is not entitled to summary judgment on either of these grounds.

IV.  **CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the defendant's motion for summary judgment is DENIED in part and GRANTED in part.

New Orleans, Louisiana, this __2nd__ day of November, 2006.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE